**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**



ALL AMERICA INSURANCE CO.,

       **Plaintiff,**

v.                                          **CIVIL ACTION NO. 4:11cv00041**

ANNETTE W. MORRIS, et al.,

       **Defendants.**

### *MEMORANDUM OPINION AND ORDER*

This matter is before the Court for decision following a one-day bench trial held on

September 25, 2012. On January 10, 2011, All America Insurance Company ("Plaintiff" or "All

America") brought this action seeking a judicial determination that it is not obligated to defend or to

indemnify Defendant T&D Metal Products, LLC d/b/a Promo Karts, LLC ("Promo Karts" or

"T&D") in an underlying personal injury action commenced by Annette Morris in the Circuit Court

for the City of Hampton, Virginia. All America also seeks reformation of its insurance policy with

T&D to include a coverage exclusion that would absolve All America of any coverage liability

related to the underlying personal injury action. Plaintiff originally filed this action in the Circuit

Court for the City of Hampton, however, Defendant Essex Insurance Company ("Essex") invoked

diversity jurisdiction and removed it to the United States District Court for the Eastern District of

Virginia, Newport News Division. The parties have submitted post-trial and supplemental briefs on

a jurisdictional question and this matter is now ripe for judicial determination.

## I. FACTUAL FINDINGS

### A. Stipulated Facts

The parties have stipulated to the following facts which the Court accepts and finds:

1. Promo Karts, Inc. and Promo Karts, LLC are defendants in an underlying tort action filed by Annette Morris on or about April 28, 2010. The Complaint filed by Ms. Morris alleges that she suffered severe personal injuries on May 3, 2008 as a result of an accident that occurred while she was operating a "mini race car" or "mini kart" during a charity racing event. Morris alleges that the injury occurred "just prior to the start of the May 3, 2008 Race," when she attempted to pull the kart forward and the car suddenly accelerated. Morris thereafter lost control of the car, and was injured when the car flipped on top of her.

2. The mini "race car" involved in the underlying accident was a go-kart designed, manufactured and sold by Promo Karts, LLC in 2008.

3. All America filed this declaratory judgment action seeking a determination as to its rights and obligations under an insurance policy issued to T&D Metal Products, LLC, d/b/a MPD Medical, Promo Karts. The All America Policy, No. CLP8377294, was effective for the period April 1, 2008 to April 1, 2009, ("the All America Policy"). The named insured under the All America Policy issued in 2008, was "T&D Metal Products DBA MPD Medical, Promo Karts."

4. The Essex Policy at issue in this case is a specified products and completed operations liability policy, effective for the period June 1, 2009 to June 1, 2010, bearing policy number SP-842545 ("the Essex Policy"). The Essex Policy applies on a claims made basis, i.e., the policy applies to covered claims first asserted against the insured during the

term of the Essex Policy. The Essex Policy is at issue herein because on or about

February 23, 2010, Promo Karts received a pre-suit claim letter from counsel for the

plaintiff in the underlying tort action. The named insured under the Essex Policy is T&D

Metal Products, LLC, DBA: Promo Karts, LLC.

5.  T&D Metal Products, LLC ("T&D") came into existence in 1951. At that time T&D

manufactured chemistry sets, rock tumblers, first aid kits and rock cutters. Roger Dittrich

purchased T&D from his father in 1985. From 1993 to 1999, T&D also manufactured

"clipper go karts," which are open wheel go-karts. In 1999, T&D purchased a company,

Midwestern Industries, which manufactured "promotional go karts" or "mini-cars."

These "mini-cars" are gokarts with fiberglass bodies.

6.  According to the Illinois State Corporation Commission records, Midwestern Industries,

LLC was formed on January 18, 2000, and was involuntarily dissolved on June 30, 2001.

7.  In 2002, the location of the go-kart production facility was moved from Goshen, Indiana

to Watseka, Illinois. At that time Mr. Dittrich wanted to change the name of the

company from "Midwestern Industries" to "Promo Karts."

8.  Promo Karts, Inc. was first incorporated on April 25, 2006, and voluntarily dissolved on

August 12, 2009; and Promo Karts, LLC first came into existence on August 21, 2009.

9.  The promotional go-karts manufactured by Promo Karts are designed to be driven by

both adults and children at least eight years old. The go-kart at issue in this case had a 6

½ horsepower engine and could go up to speeds of 18-25 miles per hour depending on

the size of the rider. The go-kart had no windows, windshield, roof, speedometer, horn,

headlights, tail lights or any other functioning lights. The go-kart was equipped with 12-

inch pneumatic tires. The go-kart was not intended by Promo Karts, LLC to be driven on

3

roads with other motor vehicle traffic and could not be licensed in Illinois or any other state. Each purchaser of the gokart was provided with an owner's manual packet which included a document entitled "General Guidelines for Safe Use of Promotional Carts." The go-kart in this case also had warning stickers that were placed on the go-kart by Promo Karts containing information regarding the safe use of the go-kart.

10. In 2002, Ronald Bensyl, an insurance agent, approached T&D to be given the opportunity to quote various insurance coverages. Mr. Bensyl was employed by the GTPS Insurance Agency between June of 1997 and August of 2009. GTPS Agency had an Agency Agreement in effect with All America as well as with other insurance carriers during the relevant time period of 2002 through 2009. Under Illinois law, which is applicable to the substantive legal issues in the within proceedings, Mr. Bensyl constitutes an agent for All America for the purpose of obtaining the All America Policy.

11. Mr. Bensyl also placed coverage in the surplus market through brokerage firms which was the case with the Essex Policy. Under Illinois law, Mr. Bensyl constitutes an agent of T&D for the purpose of obtaining the Essex Policy.

12. T&D had initially obtained insurance coverage with All America in 2002, for multiple types of coverage including worker's compensation, auto, umbrella, property and casualty, product liability and general liability. The Commercial General Liability Policy that was issued to T&D by All America in 2002 included an endorsement specifically excluding coverage for designated products subject to the language of the endorsement and all other language of the policy. The designated products excluded from coverage under the 2002 Policy included, "all products related to, manufactured by or marketed through Midwestern Industries, LLC including Klipper Karts and mini-car." This same

endorsement containing the specified products exclusion was included in the renewal policies issued in 2003 and 2004. T&D canceled its policy in 2005, and obtained coverage with Netherlands Insurance Company (Indiana Insurance) for the 2005-2006 policy period and with Westfield Insurance Company for the 2006-2007 policy period. T&D then applied again for coverage with All America in 2007 and a Commercial General Liability Policy was issued in 2007, including the same endorsement containing the specified products exclusion as referenced above. The Policy was renewed in 2008, but this time, the Policy did not contain the above-referenced endorsement.

13. All America's underwriter on the T&D account, Mel Hurless, received information from the National Council on Compensation Insurance in 2005 that Midwestern Industries purportedly changed its name to Promo Karts as of July 1, 2002. Mr. Hurless proceeded to inquire with GTPS accordingly. All America did not make that change at that time. The change was not made when the policy was re-issued in 2007.

14. During each year between 2002 and 2009, Mr. Bensyl also placed specified products and completed operations liability coverage in the surplus lines market for T&D to cover T&D's potential liability for the go-karts with a retroactive date of June 1, 1992.

15. The All America policy in effect at the time of the Accident contained an exclusion for "mobile equipment." Under Section I - Coverages: 2. Exclusions, the Policy states that "[t]his insurance does not apply to ... 'bodily injury'... arising out of: the use of 'mobile equipment' in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity."

16. Should the Court hold that coverage is afforded to T&D under the All America Policy for the loss at issue in the underlying action, the All America Policy would be considered

primary and the Essex Policy would be considered excess for such loss, such that the Essex Policy applies only upon the exhaustion of the limits of liability of the All America Policy.

## B. Additional Factual Findings

1. Ronald Klewer ("Mr. Klewer"), staff underwriter for All America (and its only live witness) had no direct involvement in the underwriting of the T &D account with respect to insuring risks associated with go-karts.[1]

2. No written underwriting guidelines were in place at All America during the relevant time period that would have specifically prohibited the insuring of go-karts.[2]

3. Plaintiff cannot identify the underwriter who actually wrote the All America Policy.[3]

4. Despite past exclusion of coverage for go-karts, T&D's principal Roger Dittrich testified he thought All America did provide liability coverage for go-karts in 2008.[4]

5. Ronald Bensyl ("Mr. Bensyl"), who constitutes an agent for All America for the purpose of obtaining the All America Policy, has no knowledge who prepared the go-kart coverage exclusion provision or how its contents were developed.[5]

6. Mel Hurless ("Mr. Hurless") testified that he did not know whether the Midwestern Exclusion was presented to T&D for its consideration and approval.[6]

7. Mr. Hurless testified he has no knowledge of the parties coming to an agreement on the language of the Midwestern Exclusion in the first instance.[7]

---

[1] Trial Tr. 13; 36-37.
[2] Trial Tr. 47-49.
[3] Trial Tr. 45-46.
[4] Dittrich Dep. 33-55; 16-18.
[5] Bensyl Dep. 56-59.
[6] Hurless Dep. 47-48, May 2, 2012.
[7] *Id.* at 48-50.

## II. CONCLUSIONS OF LAW

1.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

    1441(a) and 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between

    Plaintiff and all Defendants, and the amount in controversy exceeds $75,000.00,

    exclusive of interest and costs.  All America is incorporated in Ohio and maintains its

    principal place of business in Ohio.  Defendant Essex is incorporated in Delaware and

    maintains its principal place of business in Virginia.  Defendant T&D is incorporated

    in Delaware and maintains its principal place of business in Illinois; Defendant Promo

    Karts, Inc. was incorporated in Illinois (the corporation was dissolved on 8/12/09) and

    maintained its principal place of business in Illinois.  Defendant Promo Karts, LLC is

    incorporated in Illinois and maintains its principal place of business in Illinois.[8]

2.  A federal court sitting in diversity must apply the choice-of-law rules of the forum state.

    *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418-419 (4th Cir.

    2004).  Under Virginia law, "[a]n insurance policy is a contract, and, as in the case of

    any other contract, the words used are given their ordinary and customary meaning

---

[8] On January 24, 2013, the Court raised the question of whether the Forum Defendant Rule was violated and ordered briefing on the matter. Both Plaintiff and Defendants acknowledge that the Forum Defendant Rule has been violated. Essex, which removed this case from state court, is a citizen of Virginia as it has its principle place of business within the Commonwealth. Title 28 U.S.C. § 1441(b)(2) clearly dictates that "[a] civil action otherwise removable solely on the basis of the jurisdiction under section 1332 (a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." Despite the violation of the Forum Defendant Rule, the Court finds that it has not been deprived of subject matter jurisdiction because the violation is procedural, not jurisdictional, and was waived by the Plaintiff's failure to remand to state court within the 30 days allowed by statute. This view is consistent with the vast majority of U.S. Courts of Appeals that have addressed this question. Although the U.S. Court of Appeals for the Fourth Circuit has not reached this issue, it has held in the past that with respect to non-jurisdictional removal procedure violations, it is the parties, and not the district court, that are responsible for policing said violations and that such issues cannot be raised sua sponte by the court. *See Estate of Calzada v. Brake*, 439 F.3d 198 (4th Cir. 2006); see also *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 198 (4th Cir. 2008). Given the weight of authorities from other circuits and the Fourth Circuit's position on related issues, the Court finds that it has subject matter jurisdiction over this case.

when they are susceptible of such construction." *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397 S.E.2d 876, 877 (Va. 1990) (internal citations omitted).

3.  Under Virginia's choice-of-law rules with respect to contractual disputes, "the nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties." *Woodson v. Celina Mut. Ins. Co.*, 177 S.E.2d 610, 613 (Va. 1970) (internal citations omitted).

4.  Under Virginia law, "a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd.*, 377 F.3d at 419 (citation omitted).

5.  The insurance contracts at issue in this case were delivered to T&D through the GTPS Agency, both of which entities are located in Illinois. As such, the substantive law applicable in this case is that of the State of Illinois.

6.  In interpreting a contract's provisions under Illinois state law, "[t]he cardinal rule is to give effect to the parties' intent, which is to be discerned from the contract language. If the contract language is unambiguous, it should be given its plain and ordinary meaning." *Va. Sur. Co. v. Northern Ins. Co.*, 866 N.E.2d 149, 153 (Ill. 2007) (citations omitted).

7.  With respect to insurance contracts in particular, Illinois state law directs that:

> In construing an insurance policy, a court looks to the policy as a whole, the risk undertaken, the subject matter and the purpose of the contract. If the words in the policy are unambiguous, a court must afford them their plain, ordinary, and popular meaning. However, if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy."

*Am. Family Mut. Ins. Co. v. Fisher Dev.*, Inc., 391 Ill. App. 3d 521, 525 (Ill. App. Ct.
1st Dist. 2009) (internal citations and quotations omitted).

8. Under Illinois law, "[i]t is the insurer's burden to affirmatively demonstrate the
applicability of an exclusion." *Pekin Ins. Co. v. Miller*, 367 Ill. App. 3d 263, 267 (Ill.
App. Ct. 1st Dist. 2006) (citations omitted). Furthermore, "[e]xclusion provisions
that limit or exclude coverage must be construed liberally in favor of the insured and
against the insurer." *Pekin Ins. Co.,* 367 Ill. App. 3d at 267 (citations omitted).

9. The Doctrine of *Ejusdem generis* is recognized under Illinois law and is generally
dictates that:

> In the construction of laws, wills, and other instruments, the "ejusdem generis
> rule" is, that where general words follow an enumeration of persons or things, by
> words of a particular and specific meaning, such general words are not to be
> construed in their widest extent, but are to be held as applying only to persons or
> things of the same general kind or class as those specifically mentioned.
>
> *Red Ball Leasing, Inc. v. Hartford Acci. & Indem.* Co., 915 F.2d 306, 312 n.6 (7th
> Cir. Ind. 1990) (applying Illinois law as defined by Black's Law Dictionary)

10. Under Illinois law, a plaintiff seeking reformation of a contract must prove, by clear and
convincing evidence, that the following elements are present: "(1) the existence and
substance of an agreement between the parties and the identity of the parties to the
agreement; (2) that the parties agreed to reduce their agreement to writing; (3) the
substance of the written agreement; (4) that a variance exists between the parties'
original agreement and the writing; and (5) mutual mistake or some other basis for
reformation." *Schons v. Monarch Ins. Co.*, 214 Ill. App. 3d 601, 605-606 (Ill. App.
Ct. 1st Dist. 1991); see also *Schaffner v. 514 W. Grant Place Condo. Ass'n, Inc.*, 756
N.E.2d 854, 865 (Ill. App. Ct. 2001).

11. Under Illinois state law, the clear and convincing standard is defined as requiring that "that quantum of proof which leaves no reasonable doubt in the mind of the trier of fact of the truth of the fact in issue." *Diversified Realty Group v. Davis*, 257 Ill. App. 3d 417, 420 (Ill. App. Ct. 1st Dist. 1993) (internal quotations and citations omitted).

12. According to Illinois law, "[a] written agreement is presumed to express the intention of the parties and will not be reformed unless the evidence of mutual mistake or other ground for reformation is strong, clear, and convincing. The mistake must be one of fact rather than law, the proof clear and convincing that a mistake was made, and the mistake mutual and common to both parties to the instrument." *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.*, 118 Ill. App. 3d 754, 764-765 (Ill. App. Ct. 2d Dist. 1983) (citations omitted).

13. The issue of intent in the reformation context is considered under a subjective standard. *See United States v. Illinois Fair Plan Ass'n*, 67 F.R.D. 659 (N.D. Ill. 1975) (applying Illinois law).

14. Under Illinois state law, "the unilateral mistake of one party to a contract may not be relied upon to relieve that party from the obligations of the contract where the party's own negligence and lack of prudence resulted in the mistake." *Zink v. Maple Inv. & Dev. Corp.*, 247 Ill. App. 3d 1032, 1038 (Ill. App. Ct. 2d Dist. 1993).

### III. DISCUSSION

There are three issues to consider in resolving the dispute between the parties. First, the Court must determine if reformation of the All America Insurance Policy for 2008-2009 ("the All America Policy") to include what is referred to by the parties as the "Midwestern Exclusion" is appropriate and equitable given the circumstances. If the Court finds that reformation is appropriate and equitable, it must then determine whether the Midwestern Exclusion abrogates

All America's obligation to defend or to indemnify Defendant T&D in an underlying personal injury action in light of the language of the exclusion and the dissolution of Midwestern Industries and the subsequent creation of T&D. Finally, the Court must also determine whether a relevant provision of the "Mobile Equipment" Exclusion to the All America Policy is applicable in this case. For the reasons outlined below, the Court finds that reformation of the All America Policy to include the Midwestern Exclusion is not appropriate and equitable in this case. As such, the Court declines to reach the question of whether the specific language of the Midwestern Exclusion abrogates All America's obligation to defend or to indemnify Defendant T&D. Finally, the Court finds that the Mobile Equipment Exclusion included in the All America Policy does not apply to the go-kart at issue.

### A. Reformation of All America Policy

Under Illinois law, reformation of a contract by a court requires the party seeking reformation to show, by clear and convincing evidence, that the following requirements are met: "(1) the existence and substance of an agreement between the parties and the identity of the parties to the agreement; (2) that the parties agreed to reduce their agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) mutual mistake or some other basis for reformation." *Schons v. Monarch Ins. Co.*, 214 Ill. App. 3d 601, 605-606 (Ill. App. Ct. 1st Dist. 1991); see also *Schaffner v. 514 W. Grant Place Condo. Ass'n, Inc.*, 756 N.E.2d 854, 865 (Ill. App. Ct. 2001). Generally, "[a] written agreement is presumed to express the intention of the parties and will not be reformed unless the evidence of mutual mistake or other ground for reformation is strong, clear, and convincing." *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.*, 118 Ill. App. 3d 754, 764-765 (Ill. App. Ct. 2d Dist. 1983) (citations omitted).

As indicated above, at the heart of any reformation claim is whether a mutual mistake occurred that negated the intent of both parties for the missing or correct terms to be included in the contract. Accordingly, the Court will address whether All America presented clear and convincing evidence at trial that at the time the contract was entered into by the parties, both All America and T&D intended the Midwestern Exclusion to be included in the All America Policy. Based on the evidence submitted to the Court at trial, All America failed to meet its burden with respect to intent. As to All America's intent, despite All America's current claim that inclusion of the Midwestern Exclusion was intended, it could not offer a single witness, live or otherwise, with direct involvement in the creation of the All America Policy that could testify that it was All America's intent to exclude coverage of go-karts. While All America did provide testimony through Mr. Ronald Klewer that it was not its practice to cover the kinds of risks inherent with go-karts, Mr. Klewer admitted that All America had no generally applicable prohibition against insuring such risks.[9] Furthermore, while Mr. Klewer offered his view that not insuring the risks associated with go-karts is All America's general preference, he had no involvement in the writing or approval of the specific All America Policy and could cite no evidence in the T&D customer file that supports the contention that All America intended the Midwestern Exclusion to be included in the All America Policy.[10] Furthermore, while Mr. Klewer was able to identify the All America executive who was responsible for approving the All America Policy, John Rhodes, All America failed to provide any testimony from him regarding what all America intended to be included in the All America Policy.[11]

All America argues that the fact that because the Midwestern Exclusion was included in previous insurance policies between T&D and All America and T&D and other insurance

---

[9] Trial Tr. 47-49.
[10] Trial Tr. 43.
[11] Trial Tr. 37-38.

providers is definitive evidence that All America had intent to do so with respect to the All America Policy at issue.  All America also points to testimony by Mel Hurless indicating that during his time as underwriter of the insurance agreements between All America and T&D from 2002 to 2007, All America never intended to provide coverage for go-karts.[12]  However, as indicated above, Mel Hurless has no direct involvement with the All America Policy at issue in this case as he retired in 2007.  Hurless's testimony also fails to acknowledge the stipulated fact that T&D canceled its policy in 2005, and obtained coverage with Netherlands Insurance Company (Indiana Insurance) for the 2005-2006 policy period and with Westfield Insurance Company for the 2006-2007 policy period.  Given the break in coverage, the Court finds that testimony regarding a policy he had no involvement in writing unhelpful in determining All America's intent as to the All America Policy.

All America also argued that its intent for the Midwestern Exclusion to be included in the All America Policy is indicated by All America's failure to charge higher premiums to reflect the risk of insuring go-karts.[13]  However, as showed by the Court's questioning of Mr. Klewer, this failure to charge higher premiums is not dispositive of All America's intent to include the Midwestern Exception for two reasons.  First, Klewer indicates that there are circumstances in which All America provides financial or coverage incentives to retain a customer's business:

> Q. Okay. The next thing is this: Now, there is a period of time when this insured, a couple years, did not insure with All America; is that correct?
> A. That's correct.
> Q. Now, are there times when a company wants to hang on to its insured to keep the business?
> A. Certainly.
> Q. And are there times when you provided inducements to recover or to keep the business to an insured?
> A. I'm sorry?

---

[12] Plaintiff's Proposed Findings of Fact, 14.
[13] *Id.* at 15.

> Q. Are there times when you provide inducements or incentives to an insured to keep that insurance?
> A. Yes.
> Q. All right. So you don't know, from what you're telling me, what was involved in the negotiations between the agent and the insured, what went on between the underwriter and the agent and the insured in bringing this insured back into the fold, All America's fold in 2007 and 2008?
> A. Other than what's already documented in the file.
> Q. Okay. And in bringing an insured back into the fold or getting an insured's business, you sometimes cover things that you maybe not wouldn't cover on another occasion in order to induce them to insure with you?
> A. That has happened, but, again, it would be documented in the file that we are making an exception to do so.[14]

Klewer admits that All America has offered coverage and incentives to customers for risks it normally does not insure. However, Klewer argues that if such incentives were offered in this case, they would have been reflected in the T & D's customer file. This argument presents a problem for All America, however, because Klewer also admits that the T&D customer file does not contain any specific evidence that the Midwestern Exclusion was intended to be include in the All America Policy.[15] Adopting Mr. Klewer's reasoning, the lack of any mention of the Midwestern Exception in the T&D customer file should be dispositive of All America's intent to include go-kart coverage.

Second, under questioning from Defendant's Counsel, Mr. Klewer acknowledged All America sometimes provides coverage for product lines beyond what it normally would prefer to do:

> Q. Could you help me clarify the distinction between what they typically would do and what they wouldn't have intended to do?
>
> A. It is possible that we would inadvertently provide coverage for products. The products liability coverage is very broad. It covers all the products that the insured manufacturers have sold. If we didn't know that they were involved in that type of product, we'd be providing coverage on that certainly unintentionally.[16]

---

[14] Trial Tr. 48-49.
[15] Trial Tr. 43.
[16] Trial Tr. 31.

Again, Mr. Klewer admits that although All America generally does not provide coverage for high risk, it does indeed happen.  For the same reasons, evidence of the contents of past policies lack significant probative value in determining intent of the parties after a two year coverage break with respect to the All America Policy, the lack of a specific prohibition against inuring risks associated with go-karts, and the admission by All America that it sometimes covers products it might not otherwise want to but for its own unilateral mistake.

All America cites Mr. Bensyl's deposition testimony statement that All America intended to include the Midwestern Exclusion in the All America Policy.  However, in that same deposition, Mr. Bensyl states that as part of his normal practices, he would have worked out the language of any exclusion with his client (in this case, Midwestern Industries and its successor company, T&D).  Yet Mr. Bensyl admits that he has no recollection or knowledge of seeking inclusion of the Midwestern Exception in the All America Policy or having discussions with All America regarding its inclusion.[17]  In fact, Mr. Bensyl admits in his deposition testimony that his normal practice is to submit a coverage application to All America without any exclusions and that All America would initiate discussions regarding relevant exclusions.  As a result of this conflicting testimony from Mr. Bensyl, the Court finds that his statements regarding All America's intent to include the Midwestern Exclusion incredible and affords it no weight.[18]

Given the weight and credibility of the evidence, the Court finds that All America has failed to show by clear and convincing evidence that at the time the All America Policy was executed, All America intended to include the Midwestern Exclusion in the All America Policy.  Because All

---

[17] Trial Tr. 56-60.
[18] All America also cites emails in the record between Mr. Bensyl and Marilyn Gruss of All America dated June 27, 2008 shows clear intent that All America intended the Midwestern Exclusion be included in the All America Policy. However, while these emails show the intent of All America on June 27, 2008, it still fails to provide evidence to support All America's intent at the time the All America Policy was executed.  It has been stipulated to by the parties that the coverage period for the All America began on April 1, 2008.  Because the Bensyl-Gruss emails postdate the date the All America Policy went into effect (and thus postdate its execution), they are unavailing in establishing All America's intent.

America failed to show its intent to include the exclusion, it is unnecessary to engage in detailed

analysis of T&D's intent with respect to the Midwestern Exclusion. This is so under Illinois law

because reformation requires mutual intent of the parties to modify a contract to reflect the intent of

the parties. However, the Court notes that T&D's principal officer, Roger Dittrich, testified during

his deposition that All America historically provided products liability coverage for the karts.[19]

Although the record is clear that go-karts were historically not covered by All America, the because

subjective intent of the parties is central for the purposes of reformation, All America has offered no

credible evidence concerning T&D's intent with respect to the Midwestern Exclusion.[20]  It is also

worth noting that the fact T&D sought secondary coverage for liability related to the go-kart also

does not serve as definitive evidence of T&D's intent in light of the fact that the Essex Policy only

applies after a primary policy pays out the limit of its coverage.  In effect, the Essex Policy

contemplates the possibility that the insured will have a primary policy that will provide some

measure of coverage.

　　　In short, the Court finds that All America has failed to meet its burden of proof for

reformation of the All America Policy to include the Midwestern Exclusion.[21]  Additionally, the

Court finds that there is sufficient evidence on the record that All America made a unilateral mistake

in insuring the risks related to go-karts and that said mistake was likely the result of negligence.

Under Illinois state law, "the unilateral mistake of one party to a contract may not be relied upon

---

[19] Dittrich Dep. at 16-18.

[20] At trial, All America offered the deposition testimony of Melinda McKay, All America's Chief Financial Officer, to support its contention that T&D intended for the Midwestern Exclusion to be included in the All America Policy. Ms. McKay testified that her basis of knowledge of what T&D products were covered under which policies was her conversations with Dittrich and Bensyl and that she has no personal knowledge of exclusions in the All America Policy. McKay Dep. p. 43-44, 23-24. As such, the Court excluded from evidence information concerning McKay's knowledge of the All America Policy and any potential exclusions as hearsay and lack of firsthand knowledge. The Court overruled the objection to the extent the witness' testimony relates to her duties assigned and performed. Given this ruling, the only evidence presented by All America concerning T&D's intent is from Mr. Dittrich.

[21] Given the Court's finding of lack of clear and convincing evidence to support mutual intent of the parties to include the Midwestern Exclusion, the Court declines to reach the question of whether the specific language of the Midwestern Exclusion abrogates All America's obligation to defend or to indemnify Defendant T&D given the dissolution of Midwestern Industries and the failure of All America or T&D to correct the language in the exclusion to reflect said dissolution.

to relieve that party from the obligations of the contract where the party's own negligence and lack of prudence resulted in the mistake." Zink v. Maple Inv. & Dev. Corp., 247 Ill. App. 3d 1032, 1038 (Ill. App. Ct. 2d Dist. 1993). As such, the Court refuses All America's request for reformation of the All America Policy.

### B. Mobile Equipment Exception

All America seeks to deny coverage liability for T&D through an exclusion that is in the executed version of the All America Policy. In its complaint, All America argues that the "Mobile Equipment" Exclusion in the All America Policy absolves it of coverage related to the underlying personal injury action. As stipulated by the parties, under Section I - Coverages: 2. Exclusions, Subsection (h) dictates that "[t]his insurance does not apply to…"Bodily injury" or "property damage" arising out of: The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity." Furthermore, under Section V – Definitions of the Policy, All America argues that the go-kart at issue fits into the following definition of "Mobile Equipment" in that it is a "land vehicle[], including any attached machinery or equipment: a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads[.]"[22]

There is no dispute that the underlying personal injury occurred during a prearranged racing activity. Therefore, the only issue to be resolved is whether the go-kart at issue is considered "mobile equipment" as that term is defined in the relevant portion of the Policy. All America argues that the go-karts at issue fall within the relevant mobile equipment exclusion by virtue of

---

[22] All America argued at trial that the go-kart at issue also falls within Subsection f of the 'Mobile Equipment" definition, which includes "[v]ehicles . . . maintained primarily for purposes other than the transportation of persons or cargo." Essex objected, arguing that All America never pleaded this definition in its complaints and that this argument was only first made after the end of discovery and during briefing of cross-motions for summary judgment. Given All America's failure to raise this portion of its defense in its complaints or permission to seek leave to amend their complaints under Federal Rule of Civil Procedure 15 and because it was offered after the discovery period, the Court finds that All America's arguments based upon Subsection F of the definition are not properly before the Court.

the fact that they are "vehicles designed for use principally off public roads." All America cites testimony by T&D, through Mr. Jason Cahoe, that All America intended and warned customers that the go-karts were only for off-road use.[23] Essentially, All America takes the position that "vehicles designed for use principally off public roads" is the controlling language of the exclusion.

Essex, on the other hand, argues that the doctrine of *ejusdem generis* dictates that the relevant definition of mobile equipment use of the specific examples like"[b]ulldozers, farm machinery, forklifts" limits the exclusion to what it defines as "working vehicles" or what might more descriptively be called vehicles generally intended to support farming, logistics, or construction functions. Essex also cites Mr. Cahoe's deposition testimony that the go-karts at issue were not intended to be used in any capacity relevant to generally support farming, logistics, or construction functions.[24] Essex also argues that the go-karts are not "vehicles designed for use principally off public roads."

As an initial matter, under Illinois law, "[i]t is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Pekin Ins. Co. v. Miller*, 367 Ill. App. 3d 263, 267 (Ill. App. Ct. 1st Dist. 2006) (citations omitted). Furthermore, "[e]xclusion provisions that limit or exclude coverage must be construed liberally in favor of the insured and against the insurer." *Id.* at 267 (citations omitted). The doctrine of *ejusdem generis* is recognized under Illinois law and dictates that:

> In the construction of laws, wills, and other instruments, the "ejusdem generis rule" is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

*Red Ball Leasing, Inc. v. Hartford Acci. & Indem. Co.*, 915 F.2d 306, 312 n.6 (7th Cir. Ind. 1990) (applying Illinois law as defined by Black's Law Dictionary). Applying these principles, the

---

[23] Cahoe Dep. Tr. 34-38, 45.
[24] *Id.* at 60-61.

Court finds that the go-kart at issue does not fit within the relevant definition of "mobile

equipment" included in the All America Policy.  In accordance with the application of *ejusdem*

*generis*, the use of the words [b]ulldozers, farm machinery, forklifts" limits the scope of the

exclusion, in part, to vehicles generally intended to support farming, logistics, or construction

functions.  As indicated by Mr. Cahoe's deposition testimony, the go-karts at issue were not intended

to be used in any capacity relevant generally to support farming, logistics, or construction

functions.[25]  As part of its arguments, All America (and Essex as an alternative argument on this

issue) seem to treat the "*and* other vehicles designed for use principally off public roads" language of

the exclusion as an independent basis for applying the coverage exclusion.  The use of the word

"and" rather than "or," however, indicates that the "other vehicles designed for use principally off

public roads" language is to be read in the context of the proceeding limiting examples

("[b]ulldozers, farm machinery, forklifts") and their relevant functions.  Just as All America urges the

Court not to apply *ejusdem generis* in a manner that deprives all meaning from the definition

provided in the Policy with respect to "off public roads" language, the Court cannot interpret the

Mobile Equipment Exclusion in a manner that ignores the limiting examples included in the

definition.  This being the case, although the Court finds sufficient evidence to support the argument

that the go-kart at issue was principally for use off public roads, it does not meet the full definitional

requirements of the exclusion because the go-kart was clearly not intended to support farming,

logistics, or construction functions.  To hold otherwise would result in enlarging the Mobile

Exclusion in a manner inconsistent with principles of Illinois insurance law and the Court's

obligation to construe the language of exclusions liberally in favor of the insured (in this case,

T&D, and by extension, Essex) and against the insurer, All America.  As such, the Mobile

Equipment Exclusion does not apply in this case.

---

[25] *Id.* at 60-61.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that reformation of the All America Policy to include the Midwestern Exclusion is not appropriate or equitable. Therefore, the Court declines to reach the question of whether the specific language of the Midwestern Exclusion abrogates All America's obligation to defend or to indemnify Defendant T&D. Finally, the Court finds that the relevant portion of the Mobile Equipment Exclusion included in the All America Policy does not apply to the go-kart at issue. Accordingly, All America's claim for reformation of the All America Policy is **DENIED**. Furthermore, All America's request for declaratory judgment that it is not obligated to defend or to indemnify Defendant T&D Metal Products, LLC d/b/a Promo Karts, LLC in an underlying personal injury action commenced by Annette Morris in the Circuit Court for the City of Hampton, Virginia is **DENIED**. As the parties stipulated, because coverage is afforded to T&D under the All America Policy for the loss at issue in the underlying action, the All America Policy is considered primary and the Essex Policy is be considered excess for such loss, such that the Essex Policy applies only upon the exhaustion of the limits of liability of the All America Policy.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.

Norfolk, Virginia
February 20, 2013

Raymond A. Jackson
United States District Judge